# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
### AT NASHVILLE

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | |
| **upon the relation and** | ) | |
| **for the use of** | ) | |
| **TENNESSEE VALLEY AUTHORITY,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **CASE NO. 3:07-cv-00650** |
| | ) | |
| **ADDITIONAL RIGHTS WITH RESPECT TO** | ) | **Judge Thomas A. Wiseman, Jr.** |
| **AN EXISTING EASEMENT AND** | ) | |
| **RIGHT-OF-WAY OVER LAND IN** | ) | |
| **SUMNER COUNTY, TENNESSEE,** | ) | |
| | ) | |
| **AND** | ) | |
| | ) | |
| **AMBASSADOR PROPERTIES, LLC** | ) | |
| | ) | |
| **Defendants.** | ) | |

## REPORT OF THE COMMISSION

This commission appointed pursuant to Administrative Order number 75 of this court and Rule 71A(h) of the Federal Rules of Civil Procedure to determine the issue of just compensation for the taking of the property herein condemned files the following report.

1.     The Notice and Amended Complaint in this cause, with property description, were filed June 18, 2007. The order of possession, the investment order and the order appointing commissioners were entered shortly after that. The date of taking of this case was June 18, 2007.

2.     On September 13, 2011, the Commission met with the parties, their counsel and expert witnesses for a view of the property at the Ambassador Properties tract. The Commission had earlier met with the parties for a view of the property some two years prior. At that time it became apparent that the necessary engineering drawings and permits with regard to a road

through the easement area had not been completed and the parties were granted additional time to secure those drawings, plans, permits and approvals. At the time of the view it was clear that these had been secured, albeit not promptly. The location of the approved road is accurately reflected in Exhibits 16. and 17. being the westernmost access road on those drawings which runs to the west of the two switching stations, type SS1-35, specifically structures STR 72 and STR 73 on the Gallatin Steam Plant – West Nashville Transmission Line. (See Exhibit 1., Plan and Profile Map)

3.      The trial of this matter commenced on September 15, 2011 at the offices of Jones, Hawkins and Farmer in Nashville, Tennessee, by agreement of the parties.

4.      As a preliminary matter at the hearing the Commission was presented with a Motion in Limine from the Landowner seeking to exclude, redact or prohibit any reference to the matters in the report produced by Gene Carman as he was not an expert testifying at the hearing. Because the report had earlier been produced to the government by the landowner the motion was DENIED, with the caveat that any objections would go to the weight as Mr. Carman could not testify or be cross examined.

5.      Subsequent to the close of the hearing the landowners filed a Motion for consideration of late filed exhibits. The Government filed a response The Motion was to allow consideration of exhibits showing engineering costs of $14,100. Given  that one of the landowners, Mr. Laughter, testified that the costs were $13,500 and the exhibits were not produced at the hearing and this case has been ongoing for four years the Motion is DENIED.

6.       The take is specifically described in the Declaration of Taking (Docket No. 2-1) and the attached property description (Docket No- 2-2), as well as in Exhibit 1. The Plan and Profile Map. The take comprises a .83 acre easement within and existing easement. It is

2

described as "Gallatin S.P. – West Nashville Transmission Line Tap to Station Camp Substation" and designated as Tract GWNNTSC-1 within Tract GWN-228. It also includes Tract No. GWN-228-AS.1, which is specifically the switching structure and necessary appurtenances. (See, Docket No. 2-2, pages 1-3.) The take includes guy wire rights. At the view it appeared that there were twenty-one separate guy wires running from the 2-pole D.E. structure taking the lines down from the Gallatin S.P. – West Nashville Transmission Line to the switch structure and the 3-pole D.E. structure which takes the lines from the switch structure to the lines running to the Station Camp Substation. These lines extend outside of the new additional easement area but are within the existing easement for the transmission line.

7.      Exhibit 1 which is a full size copy of the plan and profile map describes the underlying easement as well as provides a physical description of the power lines and topography of the land.  It specifically lists the types of poles and structures which are on the easements described.  Some further description is necessary since there are a number of pre-existing easements on the subject property. The specific pre-existing easement within which the subject easement lies is   the Gallatin S.P.- West Nashville Transmission Line GWN – 228. That easement crosses the property from west to east. Another power line easement crosses the property from northwest to southeast. An easement for the L&N Railroad crosses the property from northeast to southwest. There is also a Gallatin electric substation of approximately 2.44 acres , owned in fee,  in the middle of the property between the two power line easements and the railroad. It was to supply power for this substation that the switch tap structures were created.

The following facts were stipulated:

A.      The size of the subject property is 30.96 acres.

B.      The date of take was June 18, 2007.

C.    The size of the additional rights easement itself was .83 acres.

8.    Exhibits admitted at the hearing were as follows:

Exhibit 1      Plan and Profile Map;

Exhibit 2      Appraisal Report of Russell Parrish;

Exhibit 3      Aerial map showing subject property area;

Exhibit 4      Engineering drawing of subject with handwritten marked damaged areas;

Exhibit 5      Photograph of switch structures and poles;

Exhibit 6      Map of subject with easements and additional areas affected drawn in;

Exhibit 7      Photograph of subject from highway;

Exhibit 8      Overhead photograph and map of Hendersonville-Gallatin area with properties marked;

Exhibit 9      Engineering drawing of property showing development;

Exhibit 10     Photograph of switch structures and poles from highway;

Exhibit 11     Damages calculation from Mr. Dean;

Exhibit 12     Supplemental Appraisal Report of Gary Standifer-August 10, 2011;

Exhibit 13     Appraisal Report of Gary Standifer – July 6, 2009;

Exhibit 14     Drawing from Exhibit 13 to substation condemnation case with Gallatin-No. 29328-C;

Exhibit 15     Engineering drawing of road routes on subject dated 10/16/2008

4

Exhibit 16     Engineering drawing of roads and possible buildings on subject dated 2/17/2011;

Exhibit 17     Chart of damages for land and road changes from landowner;

Exhibit 18     Aerial view of subject before road and substation;

Exhibit 19     Blown up Google map of subject with switch structures and poles drawn in;

Exhibit 20     Engineering drawing of subject with buildings and roads dated 6/30/2007.

9.     This case involved the acquisition of additional rights over an easement and right of way on .83 acres of land plus guy wire rights, more or less, in Sumner County, Tennessee. The total size of the tract from which the easement is taken, as stipulated, is approximately 30.96 acres. The parcel is able to be seen in the maps and in the various expert reports. The Commission also drove over and walked over a large area of the parcel with the parties at the viewing. The rights taken are more particularly described in the Declaration of Taking which is of record in this case as well as in the Plan and Profile Map, Exhibit 1. The land taken in the easement is dedicated by the Tennessee Valley Authority as tracts number GWNTSC-1 and GWN-228-AS.1 which are the tract and the switching structure within the tract respectively. From the plan and profile map, Exhibit 1., as well as a review by the commission, the easement comprises .83 acres plus guy wire rights. The easement within which the additional rights are taken is 275 feet wide and contains a 330 KV line from the Gallatin Steam Plant to West Nashville. The commission noted that the easement crosses the property approximately west to east in the approximate middle of the property viewed north to south. At the time of the hearing the switch structures, poles and wires had been constructed. The power line has two 161,000

5

volt circuits of three wires each with two aerial ground wires above it. There are also two switch structures approximately forty-five feet tall. There are a total of six single pole structures from approximately fifty feet to eighty feet tall. There is one "H" pole structure. There are approximately twenty-one guy wires going from five of the single pole structures. Generally speaking, three wires comprising a 161 KV circuit are pulled down from between two lattice tower structures, run to two switch structures and then back to a circuit attached to a lattice tower. Where the lines run to the switch structures they are then run to the "H" pole structure and into the Gallatin substation.

      10.     The land owners called Russell Parrish to testify as an expert appraiser. It was stipulated that he was an expert entitled to offer opinions but his methodology was not stipulated to. The Commission has been presented with challenges to expert testimony or methodology before. The Government's challenge here is based on his qualifications to apply proper "methodology", as noted in the Government's counsel's challenge (See, T.R. p. 24) and in the Supplemental Report from Mr. Standifer (Ex. 12).  Mr. Parrish bases his five percent (5%) damage to the land as a whole on his "experience and professional opinion." (See, T.R. p. 24) He based this on comparable sales and the amount they sold for per acre. (T.R. p. 26) Mr. Parrish did not use paired sales analysis because there were no sales where all other factors except the easement were the same. (T.R. pp. 26-27)  He did not think that two different appraisals could be used to split the difference and come up with damages. (T.R. p. 30) He indicated that he could have used retrospective appraisal, another accepted method, and come up with the same amount of damage after making adjustments. (T.R. pp. 31-32) There were no exactly comparable sales due to the extent of the pre-existing easements. (T.R. p. 32)  The five percent (5%) damage figure was "very mild" (T.R. pp. 32-33) He has testified as an expert in approximately ten other

land commission cases in this Court. (T.R. p. 37) He has done appraisal work for landowners and government agencies. (T.R. pp. 38-39) The Government's objection to accepting Mr. Parrish as an expert was DENIED and the objections will go to the weight given his testimony. (T.R. p. 39)

11.     Mr. Standifer sets out areas of agreement or common ground and then discusses areas of difference. (See, Exhibit 12. pp. 7 et seq.) He seems, in his supplemental report, to object to Mr. Parrish's assessment of five percent damage to the subject as a whole but his (Standifer's) method is to go through specific areas rather than the land as a whole. (See, Exhibit 12. pp. 7-8.) He indicates there is "no range of consensus." (Ibid.) He then cites a report from Gene Carman in some detail. Mr. Carman was not called as a witness by the landowner and, in fact, in correspondence to the Commission and parties about evidence prior to the hearing the Government's counsel has been at great pains to point out that Mr. Carman no longer has a license. Obviously since it was produced the Carman report is fair game for use by the Government. Whether it should be accorded any weight and if so how much is another matter. Given that Mr. Carman was not present to testify and he no longer has a license the Commission assigns only minimal weight to any parts of reports cited by Mr. Standifer that reference Mr. Carman's report. The Parrish appraisal was admitted as Exhibit 2. His report noted that he values the underlying property, as of the date of take at $3,313,497.00. He assesses damages to the entire property at five percent (5%). His total damage assessment is $165,000.00 (See, Exhibit 2, p. 4.) He found the underlying value of the property as $165,000 per acre (Ibid.) He noted the property is not in a flood plain and is zoned PGC or Planned General Commercial. (See, Exhibit 2, p. 30.) He looked at traffic count and noted Vietnam Veterans Blvd. is the main entry point to Sumner County. (T.R. p. 45) There were no other properties that had as many pre-existing easements as this property. (T.R. pp. 47-48)

7

12.     He used the sales comparison approach to value the property. (See, T.R. p. 47-51 and Exhibit 2, p. 38.) He had three comparable sales. They were: 1. Sumner 2000 to PGMW/Langley in which 42.294 acres sold on January 18, 2007 for $8,500,000 or $200,974 per acre or $4.61 per square foot; 2. Greensboro I to NCG Gallatin in which 7.033 acres sold on May 1, 2006 for $828,686 or $117,828 per acre or $2.70 per square foot; and 3. Bowles to Sumner Regional Health Systems in which 24.58 acres sold on November 9, 2006 and March 15, 2007 for $2,999,999.00 of $122,050 per acre or $2.80 per square foot. From these three sales he opined the underlying value of the subject property was $165,000 per acre. (See exhibit 1. Parrish report, pp. 40-45.) After making deductions for pre-existing damaged areas he opined that the value of the property before the take was $3,313,497.00. His before the take value taking into account the pre-existing easements was $107,000 per acre. (T.R. p. 71) He opined that putting new structures in a pre-existing easement area affected the property as a whole. (T.R. p. 71) He opined that the varying heights of the new structures and the old structures and the affect of new structures on development costs created an overall overburden of easements. (T.R. p. 72) He further opined that the remainder value was damaged 5% due to the overburden of easements. (See Exhibit 1. pp. 4 and 47.) He noted the prevailing practice of merchants and businesses using the road frontage on Vietnam Veterans Blvd. for signs on their buildings even though there is no ingress and egress and the value of that. (T.R. pp. 51 and 74) There was 2,840 linear feet of visibility frontage. (Ibid.) He noted that the damage to the property from the new structures was "incurable" due to inability to fix the "ugliness" and that impacted the property as a whole. (T.R. p. 76) He noted any screening could not go high enough to cover the height of the new structures. (T.R. pp. 78-79) The overall damage to the property was $165,000. (T.R. p. 104) He opined TVA impaired the view because with the new easement you cannot see through all the

8

pre-existing and new power lines and structures. (T.R. p. 118) There was more damage to the front of the property as it was least affected by pre-existing easement conditions. (T.R. p. 119) He could have taken an overall deduction of thirty-five percent overall for the various pre-existing easements, which was consistent with the TVA assessment of before value, and then five percent overall for the new easement. (Ibid.) He indicated the view had been obstructed and it was an eyesore. (T.R. p. 122) He noted the first thing seen from a distance is the new poles pulling down the power from the existing line. (T.R. p. 123) He opined the extra easement area (.53 acre) designated by the Government appraisers was not an adequate compensation for fall area. (T.R. p. 125) He did not include the cost of reengineering or a different road in his damage but indicated it was included in his 5% damage assessment. (T.R. p. 127) His five percent damage was very conservative. (T.R. p. 127) In his testimony he described the overburden as being due to nothing being curable, overall unsightliness, the additional power line structures being at the focal point of the property, damage from the diminution of view, both within the property and also from the adjoining highway and the resulting damage to the property as a whole and the problems caused to access to the rear property or moving the road for development of the property. ( See, Tr. pp.78-79 and T.R. pp. 130-131)

13.     The landowners called Mr. Dean Jacobs who is one of the landowners. He indicated there was much development activity in the area. (T.R. p. 132) Fifteen thousand new homes were scheduled to be built. (Ibid.) Visible road frontage was "huge". (T.R. p. 135) He indicated a driver on Highway 386 would see the new structures first because it is the sightline based on his site selection experience. (T.R. pp. 136-137) Highway 386 was projected to have the highest traffic count. (T.R. p. 139) He indicated before the new easement he was looking at movable storage buildings being able to be placed under the lines. (T.R. p. 142) For offices and

self storage units visible sight line was very important. (T.R. pp. 143-144) The new structures impede sight lines. (T.R. p. 144) He felt overall damage to the property was fifteen percent because of sightline. (T.R. p. 150) Because of that they are limited to a local buyer who will not pay as much. (T.R. p. 151) A site one mile away sold for $225,000 per acre because there were no sightline issues. (T.R. p. 153) Sight line issues are the third thing looked at by persons assessing property. (T.R. p. 155) The new towers affect the sightline from the east "dramatically" (T.R. p. 157) He felt the before value was $3,300,000 and the after value was fifteen percent less or 2,805,000 for a damage to the property as a whole of $495,000. (T.R. p. 161) The cost of realigning the road on the property is approximately $150,000. (T.R. pp. 161-162) They had plans for revenue producing self storage units. (T.R. p. 162)

14.     He indicated that easements can be situated so that they do not harm the property as much, such as the Sumner Regional medical property across the highway. (T.R. p. 172) He felt he needed to assess the damage to the property as a whole because of the market and being unable to figure exactly where buildings might be placed or a site engineered. (T.R. p. 175) He felt the elements of cure set out in the Standifer report (Exhibits 12 and 13) did not cure the damage and you could not hide the towers or switching stations or cure the damage. (T.R. p. 176) A concrete wall or chain link fence would not reduce unsightliness. (T.R. p. 179) The whole property is affected, not just the .83 and .59 acre sections. (T.R. p. 180) He is more knowledgeable about the Sumner County market. (Ibid.) He indicated the new easement affected the property as much as the Gallatin substation did. (T.R. p. 188) His opinion is based on ten years experience not specific market data. (T.R. p. 189) The landowner had a variety of plans for pods and other things in the area of the easement and other areas. (T.R. p. 197) How the property could be used was affected by the Gallatin Electric substation and the TVA easement.

10

(T.R. p. 218) The damages from his fifteen percent damages assessment were $495,000 (T.R. p. 242) He has not seen any properties as encumbered as the subject except possibly the theater property which the buyer paid about $4 less per foot than it should have brought. (T.R. p. 243)

15.    Steve Laughter, a landowner, was called as a witness. He indicated the purpose of engineering plans was to maximize the use of the property. (T.R. pp. 246-247) They got close to the line to maximize value by having boat storage availability since they were close to the lake. (T.R. p. 249) They would put some storage under the line. (Ibid.) The new lines have diminished the value of the property because of their being in the focal point of the property. (T.R. p. 250) They cannot be covered up by a wall. (T.R. p. 251) The main concern with the new easement is "It is the ugliness of where they placed them. The focal point of our property, you can see by that picture, is the reason why we're -- we're asking for compensation." (T.R. p. 254, ll. 1-4) He felt the overall damage to the property was five percent (5%) of the value of the whole. (T.R. p. 255) He also felt there was additional damage from the cost of moving and redesigning the road under the lines to the back portion of the property which now has to go under lower lines and guy wires which cost them the use of approximately .22 acres valued at $300,000 per acre or $66,000 additional incidental damages. (T.R. pp. 257-259) They also lost $13,500 from the road redesign. (T.R. p. 260) Having to cut into limestone with the new road after the easement imposition will make it more expensive. (T.R. pp. 270-271) Placing a road to the back would increase the value of the back property. (T.R. pp. 286-287) Building a fence will not mitigate the damage. (T.R. pp. 289-290) The structures would need to be hidden. (T.R. p. 290)

16.    Gary R. Standifer was called as an expert witness for the Government. He was allowed to testify as an expert and express opinions without objection. He inspected the property more than once. He issued two reports which were Exhibits 13. (Original Report, dated July 6,

11

2009.) and 12. ( Supplemental Report, dated August 10, 2011.) He used the sales comparison approach to valuation. (See Exhibits 12. and 13.) Mr. Standifer issued his supplemental report after receiving supplemental survey reports which indicated a slightly smaller size for the property, i.e., 30.96 acres as compared to 31.417 acres. Mr. Standifer's value for the property changed from $3,400,00 to $3,300,000. Mr. Parrish also modified his report based on a smaller size resulting from not counting a portion of the tract originally counted because it was not under common or joint ownership. His comparable sales are listed and discussed at pages 13 through 16 of Exhibit 13. and at Addenda H. of Exhibit 13. He utilized four comparable sales, all generally along Vietnam veterans Blvd. in Sumner County. They are: 1. Bowles to Sumner Regional Health Systems in which 24.58 acres sold on November 9, 2006 and March 15, 2007 for $2,999,999.00 of $122,050 per acre or $2.80 per square foot; 2. Sumner 2000 to PGMW/Langley in which 42.294 acres sold on January 18, 2007 for $8,500,000 or $200,974 per acre or $4.61 per square foot; 3. Bridges to ILVLB in which 23.20 acres sold on October 31, 2008 for $1,622,600 or $69,940 per acre; and 4. MARJ Properties to H.P. Avondale in which 6.54 acres sold on November 28, 2006 for $1,500,000 or $229,358 per acre. Two of his sales (1. and 2.) are also comparables used by Russell Parrish. From these he arrived at a value for the property of $130,000 if unencumbered by the new easement or any easements. He then made adjustments to reflect the pre-existing easements.

17. He testified that the view of the property and the access have been improved since the date of take. (T.R. pp. 294-296) He opined the Sumner Regional Health center sale was the most comparable generating a value for the subject of $130,000 per acre. (T.R. p. 297) He indicated that based on Case 4 in his study, Exhibit 12., he saw damage from the pre-existing easement of eighty percent (80%). (T.R. pp. 298-299) He noted his Case Study 2. that had a tap

12

structure off of a pre-existing line. (T.R. p. 300) He thought that sale "in my judgment, was a good example of a sale that you could analyze. It had a preexisting power-line easement on it, and which it was purchased and utilized for commercial purposes." (T.R. pp. 300-301) He felt he controlled he pertinent variables. (T.R. p. 302) He felt based on his case study that there was no damage to the unencumbered area outside the easement area based on the Greensboro tract. (T.R. pp. 303-305) So on the subject property there was no damage outside the right of way other than the cost to cure. (T.R. p. 305) He cited the Mid-South Bus Center sale in Murfreesboro (Case 5.) as an example of cost to cure since in that sale an adjacent electrical substation had a wall constructed around it. (T.R. pp. 305-306) This wall can be seen in photographs 1 and 2 in Case 5 of his main report in Appendix I. (Exhibit 13.) In a situation involving a substation at the cinema sale there was a berm and a large wall of trees planted around it. (T.R. p. 308) This was seen in the photographs at yellow sheet 7. in the Standifer Supplemental Report. (Exhibit 12.) All that can be seen is "The background is where the substation is, and it's shielded. You can just -- you can just see some of the tower sticking up -- part of the tower sticking up here." (T.R. p. 310) This Standifer study was his impression of visual situations. (T.R. p. 315) His study involved sales after visual screening had occurred. (T.R. p. 315) There are no sales before and after visual screening, only sales with visual screening as compared to a similar sale without visual screening. (T.R. p. 316)

18.     His assessment of cost to cure was based on an eight foot concrete block wall with gates around the two switching stations. (T.R. p. 318) The towers being screened are thirty-five or more feet tall. (T.R. p. 320) The wall in the case study 5. is taller than the wall he is proposing as a cost to cure in this case. (T.R. p. 320) The owner of the Mid-South Bus facility did not feel the substation interfered with his bus sales facility. (T.R. p. 321) The choice of

13

heights was subjective on his part. (T.R. p. 322) He has not testified about visual screening as a

cure for TVA projects before. (T.R. p. 323) He approached the two additional areas of damage,

comprising .50 and .09 acres for a total of .59, which contained guy wires, as being part of the

easement acquired. (T.R. p. 326) He damaged those two areas, both of which had the pre-

existing easement, at an additional fifteen percent (15%) for a total damage to them of $11,505.

(See, Exhibits 12 and 13, pp. 6 and 19 respectively.) He did a supplemental report because of an

inaccuracy in the size of the parcels and to address issues raised by the Carman and Parrish

reports. (T.R. pp. 328-329) There was also the issue of the landowners having the initial

Government appraisal report for two years due to the delay for engineering reasons. Both

appraisers used the Sumner Regional sale and had almost identical before values for the subject

property. (T.R. p. 332) Responding to a question from the Commission,

"Is it possible that -- that two qualified appraisers can use different        methods   and,
if they reach the same bottom-line conclusion after looking at        comparables,    that    either
method would be    acceptable?         THE WITNESS:      As long as the method is based on
analysis and some data, you know, that would      be my opinion.  I'm not trying to be critical
of -- of anybody.  I'm just telling you        how I did  what I did." (T.R. p. 333)

He indicated he used cost to cure because he felt there needed to be some kind of visual

barrier. (T.R. p. 335) This was a reflection of the value of the damage. (T.R. p. 335) He indicated

he felt his Case Studies 7 and 14 indicated no damage from the power line to commercial and

office properties. (T.R. pp. 337-338) He felt a damage of ninety-five percent to the additional

easement areas was justified because of the new easement and new structures. (T.R. p. 342) He

used one paired sale for that adjustment. (T.R. p. 345) He indicated five percent damage to the

property as a whole was not unreasonable. (T.R. p. 347) His cost to cure was one percent, but a

more effective cost to cure would be  higher (T.R. p. 351) A higher wall would lead to a higher

cost to cure. (T.R. p. 352) He did not look at what property sold for before the screening, put in

14

screening and see what it sold for afterwards. (T.R. p. 354) His cost to cure only covers the two switching stations. (T.R. p. 357) One of the lattice towers on the site was hit by a tornado and damaged and portions fell. (T.R. pp. 362-363. ) If the cost of building a bigger pump station was added into the Sumner regional cost it's per acre value would be higher. (T.R. p. 367) He also included $9,500 for cost to cure for the road to the rear of the property, with the road being graded, not paved, or graveled. (T.R. pp. 368-369)     The wall around the bus station is significantly higher than the wall he is proposing and used a more expensive block. (T.R. pp. 372-373)

19.     Both experts opined that the Bowles to Sumner Regional Health Systems in which 24.58 acres sold on November 9, 2006 and March 15, 2007 for $2,999,999.00 or $122,050 per acre or $2.80 per square foot was the most comparable sale. Both experts came up with almost identical before values for the subject tract, i.e., $3,300,000 by Mr. Standifer and $3,313,000 by Mr. Parrish. That amounts to approximately four tenths of a percent or .0039 difference out of over $3,300,000 value. The Commission accepts Mr. Standifer's starting value although there is no practical difference in the two. And the Sumner Regional Health sale meets the   requirements for comparability. "[C]omparability is a function of three variables: the respective characteristics of the properties, their geographic proximity to each other, and the closeness in time of the sales." _United States v. 68.94 Acres of Land,_ 918 F.2d 389, 399 (3d Cir .1990); Unif. Appraisal Standards 47 (specifying nine "basic elements of comparison": property rights conveyed; financing terms; conditions of sale; market conditions; location; physical characteristics; economic characteristics; use and zoning; and non-realty components of value included in the sale property).

15

20.     Mr. Parrish used the term overburden in his assessment of damage. The concept of "overburden" as applied to easements has been discussed by a number of courts, notably in several recent opinions of the Tennessee Court of Appeals. In ***Regen v. East Fork Farms, LP***, 2009 WL 3672788 (Tenn. Ct. App. 2009) the Court noted that for there to be an overburden there must be additional burden as opposed to merely an increase in the degree of the burden. (***Ibid***. p.3. citing ***Shooting Point, LLC, v. Westcoat***, 265 Va. 256, 576 S.E.2d 497, 503 (Va. 2003))   Further , in ***Rawdon v. Johnston***, 2010 WL 4867451 (Tenn. Ct. App. 2010) the court noted that where there is no significant change in the use contemplated for the easement that has occurred there is no overburden, ( See, ***Ibid***. p. 3, citing ***Carbone v. Vigliotti***, 222 Conn. 216, 610 A.2d 565, 569 (Conn. 1992).) Or as noted by the Court in ***Regen v. East Fork Farms***, supra, at p. 3, 'an increase in traffic over an easement in the process of normal development of the dominant estate, in and of itself, does not overburden a servient estate." citing ***Weeks v. Wolf Creek Industries, Inc.***, 941 So.2d 263, 272 (Ala. 2006). The ***Wolf Creek*** Court further noted that "Ordinarily, to support a finding of overburdening, it must be shown that the use has changed in *kind*, rather than *extent*." citing ***Shooting Point***, supra, 576 S.E.2d at 503. This is consistent with the cases concerning the definition of the extent or limits of the take. "Since, as indicated above, the construction rights have been fixed and defined by the plan and profile map and/or the actual construction of the transmission line, any substantial departure there from in the future would constitute an additional taking for which compensation must be paid at that time," See, ***United States ex rel. TVA v. An Easement and Right of Way in Dekalb County, Tennessee***, 182 F. Supp. 899, 902 (M.D. Tenn. 1960, Judge Miller). So, clearly, here there has been a change in the "extent" or "kind" of use such that there has been an overburdening since a new condemnation has taken place. Mr. Parrish's use of the term overburden is appropriate.

16

21.    Mr. Standifer raised two additional propositions in his testimony and reports that it is necessary for the Commission to address. The first is the discussion of "cost to cure", which in Mr. Standifer's testimony and reports had two specific elements. One was $9,500 for the grading of a roadway. The other was $17,800 for the cost of building an eight foot high concrete block wall around the two new switching stations. Cost to cure is a valid method of appraising damages but it may not exceed the cost of damages or the loss in value of the land affected. See, *Department of Transportation v. Haggerty Corridor Partners Limited Partnership*, 2003 WL 21699884 (Mich. App. 2003) p. 3. As noted by the Tennessee Court of Appeals,

"However, this is merely a peripheral issue because the proper measure of **damages** to land remaining after a partial taking is the decline in the fair market value of the property by virtue of the taking. *Shelby County v. Kingsway Greens of America, 706 S.W.2d 634, 638 (Tenn.App.1985); State v. Parkes, 557 S.W.2d 504, 507 (Tenn.App.1977).* Signer's evidence that the cost to replace the six inch water line was $12,171.00 is not a proper measure of **damages**, although the "**cost** to **cure**" is an element that can be considered in determining the diminution of value. *Shelby County, 706 S.W.2d at 638.*"

See, **State ex rel Department of Transportation v. Signer**, 1995 WL 373893, p. 2., not reported in S.W.2d, (Tenn. Ct. App. 1995).

Likewise,

""**Cost** to **cure**" is admissible to show diminution of the value of the remainder of a tract after a partial taking by eminent domain, but such evidence could not support a verdict for incidental **damages**, absent proof in the record concerning the proper measure of **damages**, i.e. the diminution of value of the property. *Shelby County v. Kingsway Greens of America, Tenn.App.1985, 706 S.W.2d 634*"

See, **Tennessee Department of Transportation v. L. W. Scribner**, 1994 WL 44949 (Tenn. Ct. App. 1994) p. 3.

From these cases it would appear that cost to cure is an acceptable element of damages as long as it does not exceed the diminution of value.

17

22.     Mr. Standifer also raised the issue of the use of "paired sales analysis" for purposes of studies and methodology. Paired sales analysis has been defined as "the data derived from comparable properties sold twice within the period of research." This is in essence a before and after. See, *Tax Increment Financing Commission of Kansas City, Missouri v. Romine*, 987 S.W. 2d 484, 489  (Mo. Ct. App, 1999), citing **Elam v. Alcolac, Inc.**, 765 S.W.2d 42, 218 (Mo.App. W.D.1988). Likewise paired sales has been defined as "use of "**paired sales**" **analysis**, which pairs comparable properties in order to value a point of difference. For example, to decide if the presence of a gravel pit would affect value, a property in the neighborhood of a pit is compared to a similar property without such an influence." See, *Shelley Materials v. Daniels*, not reported in N.E.2d,  2003 WL 77176 (Ohio. App. 2 Dist.) p. 11.  Paired sales analysis has been further defined as where an appraiser has "performed a detailed **paired sales analysis** by selecting property near external structures such as water towers, power lines or cellular towers, and property which was not, adjusting for any other differences in the pair of properties, and comparing the two types of property in order to measure the effect of the structure on real estate values." See, *Cellular Telephone Company v. Zoning Board of Adjustment of the Borough of Ho-Ho-Kus*,  24 F. Supp. 2d 359, 371 (D. New Jersey, 1998)

23.     The Commission will first address the issue of "cost to cure" damages. It is clear that cost to cure may be an element of damages. To be considered the assessment of costs to cure must be credible. The Commission deems the assessment by Mr. Standifer of a cost to cure of $17,800 for a wall and $9,500 for grading for a road to be not adequate, and therefore not credible, to actually "cure" the visual line of sight problems and the road construction problem. The wall is too low and not extensive enough and it is in no way comparable to the Mid South Bus Company wall. Likewise to think that $9,500 cures the problem of moving the road in

18

strains credibility. Also the case studies used by Mr. Standifer either utilized wires on lattice towers substantially above the ground or had substantial visual shielding such that that little if any of the low lying wires could be seen. Examples of that are either the Mid South Bus wall or the berms with thick trees on them.  For those reasons the Commission does not deem Mr. Standifer's assessment of costs to cure adequate.

24.     Next is the issue of paired sales analysis and its affect on whether a methodology is appropriate or appropriately used. The Government was at great pains to point out that  paired sales analysis was the best method to use. There are other acceptable and used methods, such as judgment. But paired sales analysis, as the Commission understands it a paired sale may either be the same property sold twice, once without the characteristic at issue and once with the characteristic. See, *Tax Increment Financing Commission of Kansas City, Missouri v. Romine*, 987 S.W. 2d 484, 489  (Mo. Ct. App, 1999), citing **Elam v. Alcolac, Inc.**, 765 S.W.2d 42, 218 (Mo.App. W.D.1988). Or, a paired sale may be two comparable sales one of which has a point of difference and one of which does not. See, *Shelley Materials v. Daniels*, not reported in N.E.2d, 2003 WL 77176 (Ohio. App. 2 Dist.) p. 11.  If there a any other differences they are adjusted for. See, *Cellular Telephone Company v. Zoning Board of Adjustment of the Borough of Ho-Ho-Kus*, 24 F. Supp. 2d 359, 371 (D. New Jersey, 1998). The Commission has difficulty seeing where Mr. Standifer's paired sales are true paired sales. His power line affected sales are all with tall lattice towers where the lines are far above the ground, thereby creating none of the line of sight issues complained of by the landowners, or, they have a true barrier such as the Mid South Bus high wall or the berms with tall bushy trees. This they do not seem to be true paired sales. The Commission further notes the two appraisers agree on the most comparable sale which is the Sumner regional sale diagonally across the highway where the property was also affected by a

19

power line easement. While it is easy to see how a parking lot or movable modular storage unit could be placed under such a line it is extremely difficult to see how such a building or storage could be placed in and around the switching towers, H pole structures, guy wires and additional poles either in the way or not more than thirty five above ground. This conglomeration of poles, structures and wires, either to the ground or thirty five feet above ground makes it substantially more difficult to create a commercial activity or to run a road, as demonstrated by the time and effort it took to get an approved road engineering plan. For those reasons Mr. Standifer's criticism of Mr. Parrish's methodology is not accepted by the Commission. Mr. Parrish and Mr. Satndifer both used the same most comparable sale.

25.    The next issue is the appropriate amount of damages to the landowner. ***United States of America ex rel. TVA v. Easements and Rights of Way over 6 Acres of Land***, 117 Fed. Appx. 422, (6th Cir. 2004), (referred to as the ***Steam Mill Ferry*** case, from one of the parties in that case.) There were three factors in the Sixth Circuit's decision. First, what is the accurate measure of compensation? It is the difference  between the fair market value of the whole tract before and after the taking, citing ***United States of America v. 2847.58 Acres of Land,*** 529 F.2d 682, 686 ( 6th Cir. 1976) Second, and not relevant here, did the evidence support the rate of mining? Third, did the evidence support the idea that areas outside the actual easement were affected See, 117 Fed. Appx. 422 at page 4.  Frankly, the Commission sees little relevance of the cited case to the present case.

26.    Based on the testimony of both Mr. Standifer and Mr. Parrish the Commission deems that the Bowles to Sumner Regional Health Systems sale and the Sumner 2000 to ILVLB sale were the two most comparable sales. The underlying values of the property from the two appraisers were within $13,000 of each other out of over three million. While both appraisers

20

made appropriate adjustments of the before value to take into account the several pre-existing easements the Commission credits the before value of the subject property of Mr. Standifer which was $3,300,000.

27. Below is a table summarizing the opinions of the landowner and the appraisers. There will be discussion in the Commission's Report relative to these various damage and value assessments and also an attempt to assess and reconcile the various points of the testimony noted below. This summary is not the entirety of their opinions but lists the major relevant parts:

| Appraisers/ Landowner | Dean Landowner | Laughter Landowner | Parrish | Standifer |
|---|---|---|---|---|
| Highest and best use | Commercial | Commercial | Commercial | Commercial |
| Value per acre | 165,000 | 165,000/acre | 165,000/acre | 65,000/ acre/north 130,000/front of Gal/SS |
| Percent of damage | 15% | 5% | 5%/prop/as/whole | |
| Damage to easement | | | | 16,185-.83 acre 11,505-.59 acre |
| Incidental damage | | 66,000/guys and 13,500/road | | 27,300/cost/to/cure Fence(17,800) and road(9,500) |
| Property as a whole | 495,000 | | 166,000 | |
| Amount due landowner | 495,000 | 245,500 | 166,000 | 55,000 |

28. The differences of opinion of the witnesses were less than the Commission has seen in some areas and more in others. The two expert appraisers had almost identical before values for the property. On the amount due the landowner they differed but not as much as the Commission has seen in the past. Mr. Standifer found overall damage if $55,000 and Mr. Parrish found overall damage of $166,000. The differences involved the underlying value of the property, the extent to which they should assess damage outside the take, and the existence and

extent of incidental damages. There were substantial differences as to the amount of incidental damage ranging from cost to cure damages of $27,300 and further incidental damages of $11,505 for an area around guy wires by Mr. Standifer to Mr. Parrish assessing damage to the property as a whole of $166,000. Thus total damages varied from $55,000 to $166,000 from the appraisers to $495,000 by one of the landowners. This is an approximate 300% difference for the appraisers. The Commission is not required to accept either the high or low testimony but may form its own judgment as to the total loss occasioned by the take. The Commission must be realistic and make its judgment as to what testimony is realistic. See, *U.S. ex rel. TVA v. Easement in Logan County, Kentucky*, 336 F.2d 76, 80 (6th Cir. 1964), on remand 246 F. Supp. 263, aff'd 375 F.2d 120 (6th Cir. 1967). Testimony which is unreasonable and would, to the Commission's own knowledge, be inconsistent may be disregarded. See, *Instructions to Commissioners*, 61 F.R.D. 503, at 507-508. The fair market value for the highest and best use of the property is the generally accepted standard for determining "just compensation" if the property is taken by condemnation. See, *United States v. 1,291.83 Acres of Land*, 411 F.2d 1981 (6th Cir. 1979).

29.     Generally a district court's decision to admit or not admit expert opinion and reports is reviewed on an abuse of discretion standard. See, *General Electric Co. v. Joiner*, 522 U.S. 136, 138, 118 S.Ct. 512, U.S.Ga. (1997). *General Electric v. Joiner* was a jury case. Where the factual bases of a study are so dissimilar to the facts of the case at issue it is not an abuse of discretion for a trial court to reject the study. *General Electric, supra*, 522 U.S. at 144-145. "The gatekeeper doctrine was designed to protect juries and is largely irrelevant in the context of a bench trial." See, *Deal v. Hamilton County Board of Education*, 392 F.3d 840, 852 (6th Cir. 2004). For that reason the Government's request to disallow Mr. Parrish's opinions because of a challenge to his methodology as a basis for his opinion is DENIED. The Commission consists of

22

experienced trial lawyers who are familiar with expert testimony and its uses and abuses. The Commission has heard these very experts testify many times and has read and re-read the various expert reports and studies. As a general proposition the Commission gives far less weight to studies than it does to the actual comparable sales analysis and particulars of the property in question. The Commission has seen many truly enormous and basically unhelpful studies over the course of its hearings. The Commission has yet to see one that is truly valid or reliable. Noted here is the assertion by the Government that only a "paired sales analysis" is the proper basis for methodology for a study. The Commission has discussed this in Paragraph 19. above and does not deem the attack on Mr. Parrish's methodology valid. As a general rule, and here, the Commission lets the impact of the studies go to the weight given to them, rather than serve as a basis for accepting or rejecting outright a given expert's opinion. It is worth noting in this regard that both TVA's and the Landowner's experts found basically identical before values for the property and as both found damage to the area outside the easement. They differed only as to its extent, albeit substantially.

30. Further, the *Instructions to Commissioners*, under which this Commission operates, 61 F.R.D. 503, 506 (E.D. Tenn. 1973, Judge Taylor), have an extensive discussion about the assessment of credibility and the weighing of the evidence. As Judge Taylor noted there, "Expert or opinion testimony is only as good as the facts and assumptions upon which it is based and if such testimony is without any support in the demonstration and physical facts, it is worthless and may be disregarded.... In considering such testimony it is your duty to determine whether such opinion is correct or erroneous, and in arriving at your conclusion you should consider the manner and demeanor of the witness, the bias or lack of bias, the grounds upon which the witness based his opinion, his experience and knowledge of the matters about which

Case 3:07-cv-00650   Document 28   Filed 11/30/11   Page 23 of 32 PageID #: 478

he is testifying, particularly his knowledge of the property, along with other evidence in the case, and the reasonableness or unreasonableness of his opinion as viewed in the light of the knowledge and experience of the witness."

31. While the studies have been presented there was little testimony or proof about how the studies came to be done, what questions they were addressing and generally the "methodology and explanatory power of the statistical analysis...". *Taylor v. Proctor and Gamble Company*, 178 F. 3d 1296, (Table), 1999 WL 232695 (C.A. 6 (Ohio)) citing, *Simpson v. Midland-Ross Corp.*, 823 F. 2d 937, 944 ($^{6th}$ Cir. 1987). As the *Taylor v. Proctor and Gamble* court stated," Statisticians working from the same corpus of data often disagree at trial on the statistical significance of data - based on collection techniques, sampling methods, groupings, calculations used, control variables, etc." *Ibid.* There were a number of questions from counsel as to whether or not a paired sales analysis was proper if the sales paired did not look at property before imposition of a power line easement and after imposition or whether the sales were truly "paired". There was significant disagreement over what the variables should be, as noted at length in cross examination For a statistical study to "contribute anything of value" it is necessary that "the data base numerically mirrors reality. If it does not in substantial degree mirror reality, any inferences empirically arrived at are untrustworthy." See *McCleskey v. Kemp*, 481 U.S. 279, 107 S.Ct. 1756, 1765 (1987) citing *McCleskey v. Zant*, 580 F. Supp. 338, 353-360 (N.D. Ga. 1984). Based on the various cross examinations this was especially troubling to the Commission since there was little, if any, clarity about exactly what reality the database mirrored. Control of variables is important, particularly in this case and in land commission valuation cases generally, because what is being attempted to be done is the measurement of the influence of "potentially influential variables".

24

32.     The Commission is bound by Judge Taylor's admonition in the *Instructions*. The Commission must consider the grounds upon which the witness bases his or her opinion and if they do not exist may disregard it. In the Commission's view none of the proffered case studies adequately controlled variables. Examples of that are the differences between low hanging wires and structures on the ground as opposed to higher wires and structures, as well as, the use of shielding as a cure where it does not actually shield and therefore does not cure. The Commission does not question their expertise, only the weight to be accorded such "studies".

33.     In this case, the Commission believes the assessment of value issue has two parts, using the method allowed in the *Instructions* of assessing the damage to the land as a whole. The first of these is what is the underlying value of the property.  The second is the amount of damage to the property as a whole.

34.     The Commission participates in a view for a reason. The reason is to "enable them (Commissioners) to better understand and weigh testimony which they hear." The Commission may 'take into consideration what you (Commissioners) will see on the view; and you will base your awards on both the view and the testimony you will hear." See, ***Instructions***, p. 3. Where, as here, the property outside the easement  is commercial and "sight lines" to either buildings or signs on buildings  is diminished by the presence of the power line due to inability to see then there is diminution of view. The Commission was able to observe during the view the density of lines and structures in the new easement area and its affect on the ability to see through or over the area where the new easement is. Likewise the Commission was able to observe the location and placement of guy wires and their effect on use of the areas around both new and old pole structures. And the Commission was able to observe the presence of rock which would require blasting close to the surface of the ground where the relocated road must

now go under the approved engineering plan. This was discussed in Mr. Laughter's testimony. Further the Commission could see clearly from the pictures of "cures" in Mr. Standifer's report, ( Exhibits 12. and 13.) that his proposed cures were insufficient in size and quality to cure. Likewise the proposed cost for merely grading a road of $9,500 does not cure the cost of changing the location of the road to the north or back of the property.

35. A landowner's testimony as to the value of his property is not always sufficient testimony on which a verdict can be based. It is not acceptable for the landowner to show "that his plans have been frustrated by the taking of his property, or what the land was worth to him, because these are all matters which are personal to the owner and do not have a bearing on the market value of the property or the compensation to which the owner is entitled." See, *Instructions*, p. 4. There must be a basis for the landowner's valuation, and when the landowner's own testimony shows that his valuation has no probative value, the court may determine that the landowner's testimony alone is insufficient to support a jury verdict. *Sowards,* 370 F.2d at 92 ("[W]here the presumption of the owner's special knowledge is negated by his own testimony, his opinion has no probative value and is insufficient to sustain the award."); *see also Kestenbaum,* 514 F.2d at 698-99; *Klapmeier v. Telecheck International, Inc.,* 482 F.2d 247, 253 (8th Cir.1973). A landowner's opinion must have probative value and have a relationship to market value. See, *United States v. 901.89 Acres of Land*, 436 F.2d 395, 399-400 ( 6th Cir., 1970) citing *United States v. Trout*, 386 F.2d 216, 223, n. 10,( 5th Cir. 1967). Here, the landowner's testimony as to damages to land value was not consistent with the damages found by the appraisers and they became so turned around in their testimony that it was difficult to understand the exact basis for it. Hence the Commission cannot credit that portion of the landowner's testimony which was completely outside the realm of the appraisers' testimony. For instance Mr.

Case 3:07-cv-00650   Document 28   Filed 11/30/11   Page 26 of 32 PageID #: 481

Laughter found five percent damages to the property as a whole, but, he then added damages for the road construction and extra engineering costs. These would overlap or duplicate damages. Likewise Mr. Dean's testimony about damages was not nearly as understandable as his discussion of the commercial real estate buying process and such things as "sight lines", which latter was able to be observed by the Commission at the viewing.

36.     What the Commission was able to observe at the view also affected its ability to accept, or not Mr. Standifer's assessment of incidental, or "cost to cure" damages. The Commission spent more than an hour under and around the new easement's poles, switching structures and lines. It also observed them from the road. Their ability to be cured was affected by their density, their height and their dispersion around the site. The poles were up to eighty feet tall. The switching structures were approximately thirty-five feet tall and dense. There were a number of wires associated with the tap into the 330 kilovolt line. All of this was at the highest point of the property, as well as at a chokepoint for the road to the back or north of the property. The Commission was also presented with a number of photographs of a possible wall structure to "cure" the view and the Commission was presented with other "cures" using berms and trees. Mr. Standifer's proposed "cure" was not in fact comparable in either effect or cost to the cure of the substation next to the Mid South Bus company building and parking lot. That wall was close to twenty feet tall and surrounded the entire substation. Mr. Standifer's proposed wall was eight feet tall and was around only the two switching towers.  Nor was it comparable in effect to the shown cures using berms and trees. Therefore his "cost to cure" was not deemed sufficient by the Commission to "cure" the visual impact of the area of poles, switch structures, guy wires and transmission wires in the new easement. It became apparent that the assessment of overall damages of five percent by Mr. Parrish was more nearly the "cost to cure" of the easement if

27

such were attempted. Or, it was a conservative assessment of damages to the property overall.

37.     As a result the Commission credits Mr. Parrish's testimony. "[C]omparability is a function of three variables: the respective characteristics of the properties, their geographic proximity to each other, and the closeness in time of the sales." _United States v. 68.94 Acres of Land,_ 918 F.2d 389, 399 (3d Cir .1990); Unif. Appraisal Standards 47 (specifying nine "basic elements of comparison": property rights conveyed; financing terms; conditions of sale; market conditions; location; physical characteristics; economic characteristics; use and zoning; and non-realty components of value included in the sale property). The court's authority under _Fed.R.Civ.P. 71A(h)_ to exclude evidence of sales of dissimilar properties is affirmed with regularity. "The questions of whether [comparable sales] transactions are near enough in time, or involve substantially similar lands, or significant amounts of land are all questions of the remoteness of the evidence offered and in consequence are for the trial court." _Baetjer,_ 143 F.2d at 397. Since no two pieces of land are ever exactly alike, "parcels may only be compared where the dissimilarities are reduced to a minimum and allowance made for such dissimilarities…There is no basis, however, to rely on patently remote transactions when more comparable sales are available. _Cf. United States v. 100 .80 Acres of Land,_ 657 F.Supp. 269, 274 n. 7 (M.D.N.C.1987) ("The record supports that the [subject property] is unique in its location and relation to the market, and therefore, that no comparable sales exist.")." See, _U.S. v. 10.082 Acres of Land_, No. CV05-00363-PHX-NVW, 2007 WL 962846, page 4 of 12, ( D. Ariz. 2007, Judge Wake).  For the reasons noted above, the Commission credits Mr. Parrish's method of valuing the entire property as a whole which is consistent with the **_Instructions_** and the case law.

38.     The size, scope and visual impact of this power line, as observed at the view, as documented by the photographs in evidence and as explained and described by the  witnesses, is

28

very significant. That significance is amplified by the fact that the easement is at the center of the property and is visible from the roads and all the property, as observed at the view. As noted above, The Commission is not required to accept either the high or low testimony but may form its own judgment as to the total loss occasioned by the take. The Commission must be realistic and make its judgment as to what testimony is realistic. See, *U.S. ex rel. TVA v. Easement in Logan County, Kentucky*, 336 F.2d 76, 80 (6th Cir. 1964), on remand 246 F. Supp. 263, aff'd 375 F.2d 120 (6th Cir. 1967). Testimony which is unreasonable and would, to the Commission's own knowledge, be inconsistent may be disregarded. See, *Instructions to Commissioners*, 61 F.R.D. 503, at 507-508. Also as noted above the Commission must make its own assessment of credibility. The Commission cannot accept the landowner's assessment of damage. The Commission does accept Mr. Parrish's assessment of damage to the entire property and notes that it is a conservative assessment which would take into account diminution of view, increased costs and affect on commercial use of the property. The Commission credits the assessment of damage to the entire property of as noted above. This yields a total compensation due of $165,000.

39.    The Commission credits the assessment of all appraisers that there is diminution of value to the property based on "apprehension of injuries to person or property by the presence of power lines on the property (which) is based on practical experience and may be taken into consideration in so far as the lines and towers affect the market value of the land." *See, Hicks v. United States for the use of the Tennessee Valley Authority*, 266 F.2d 515, 520 (6th Cir. 1959). This analysis was affirme*d in United States ex rel. TVA v. Easement and Right-of-way*, 504 F.2d 305, 309 (6th Cir. 1968). It must be demonstrated that there is an actual profitable use or a market demand for the prospective use. *See, United States v. Easement and Right-of-Way 100*

29

*Feet Wide*, 447 F.2d 1317, 1319 (6th Cir. 1971). All appraisers and landowners agreed that the new easement affected the value of the property. All agreed it was commercial property. All agreed the road location was affected.

40.     It is further clear from the testimony of the witnesses that the land has the potential of commercial now. That potential may be used as a basis for a just compensation award. See, *U.S.  ex rel. and for the use of TVA v. Hughes*, 251 F. Supp. 930 (E.D. Tenn 1966).

41.     The Commission is then confronted with the issue of the amount of damages to the property. The Commission's award of loss of value, however, is to be for the fair and reasonable value of the property as a whole. See, *Instructions to Commissioners*, 61 F.R.D. 503, 514 citing *United States v. Myer*, 113 F.2d 387 (7th Cir. 1939), cert. denied, 311 U.S. 706, 61 S.Ct. 174, 85 L.Ed. 459 (1940).   Testimony which is unreasonable and would, to the Commission's own knowledge, be inconsistent, may be disregarded. See, *Instructions to Commissioners*, 61 F.R.D. 503, at 507-508.  The Commission does agree that there is damage from the public apprehension of power lines as noted in *Hicks, supra*.  Likewise the Commission may consider as damage the unsightliness of towers and transmission lines in the locality as well as changes in the character of the ground which arises from such clearing. See, *U.S. v. Robertson*, 354 F.2d 877, 880-81 (5th Cir. 1966).  See also, *Easement in Logan County, supra*. The landowner had the burden of proving the fair market value of the condemned land. *United States ex rel. and for Use of T.V.A. v. Powelson, 319 U.S. 266, 273, 63 S.Ct. 1047, 87 L.Ed. 1390, 1396-1397 (1943); United States v. 1291.83 Acres of Land, 411 F.2d 1081, 1084 (6th Cir. 1969)*.

42.     The Commission is then confronted with the question of what damage is realistic. There is disagreement as to the amount and basis for incidental damages. The Commission must

be realistic and make its judgment as to what is realistic. The Commission has formed its own judgment, based on the testimony of the witnesses, as to the loss occasioned by the take. See, *U.S. ex rel. TVA v. Easement in Logan County, Kentucky*, 336 F.2d 76, 80 (6th Cir. 1964), on remand 246 F. Supp. 263, aff'd 375 F.2d 120 (6th Cir. 1967). Testimony which is unreasonable and would, to the Commission's own knowledge, be inconsistent may be disregarded. See, *Instructions to Commissioners*, 61 F.R.D. 503, at 507-508. As noted above the Commission partially credits Mr. Evans's testimony.

43.     Based upon all of the evidence produced at the hearing on this matter, aided by personal examination of the property in the presence of the parties and their attorney, the Commission is of the opinion that the calculation of damages, as of the date of taking, assuming a seller under no compulsion to sell and a buyer under no compulsion to buy, neither of whom is compelled to do so, and both of whom were in possession of all the known facts, using the method of calculating the damage to the exact area covered by the easement and adding any incidental damages to the remainder, as assigned by the *Instructions*, is as follows: damages to the entire property are $165,000. Therefore total damages are $165,000. Hence the Commission respectfully reports that the just compensation due the landowner(s) is $165,000.00.

Respectfully submitted,

s/ William H. Farmer
William H. Farmer, Chairman

s/ Jack W. Derryberry, Jr.
Jack W. Derryberry, Jr., Commissioner

s/ Horace Johns
Horace Johns, Commissioner

31

## CERTIFICATE OF SERVICE

I certify that a true and correct copy of the foregoing Report of the Commission has been served by the CM/ECF system to Mr. Edwin W. Small, Assistant General Counsel, Tennessee Valley Authority, 400 West Summit Hill Drive, Knoxville, Tennessee 37902-1401; Mr. Philip Pfeifer, Attorney, Tennessee Valley Authority, 400 West Summit Hill Drive, Knoxville, Tennessee 37902-1401, and Mr. Nathan Harsh, Harsh & Harsh, 123 Public Square, Gallatin, TN 37066 on this the 30th day of November, 2011.

By: ____s/ William H. Farmer_____